IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PALO PINTO COUNTY           §
CONSERVATIVES, et al.       §
                            §
VS.                         §        ACTION NO. 4:24-CV-328-Y
                            §
LONG, et al.                §

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' motion for a preliminary injunction (doc. 5). For the reasons expounded below, the Court will deny the motion in accordance with its order dated April 26, 2024 (doc. 16).


**BACKGROUND**

This case arises out of an order adopted by the commissioner's court of Palo Pinto County, Texas ("the County"), on April 8, 2024. (Docs. 1, 6.)[1] Plaintiffs Palo Pinto County Conservatives and Grass Roots Mineral Wells Political Action Committee ("PAC") are related organizations with the purpose of supporting challenger candidates in the imminent election for the Mineral Wells city council.

---

[1] All recitations of fact, except when cited otherwise, are taken from Plaintiffs' complaint and brief in support of their motion for a temporary restraining order.

Plaintiff Johanna Miller is the leader of the unincorporated Palo Pinto County Conservatives, and the treasurer of the Grass Roots Mineral Wells PAC. Defendants, in their official capacities, are the Palo Pinto county judge and Palo Pinto county commissioners responsible for adopting an order establishing regulations upon the use of county property during elections, which Plaintiffs challenge as unconstitutional.

Specifically, the County adopted a new "Electioneering Regulations Order" ("the Order") imposing restrictions on various forms of political activity on county-owned property used as a voting location. Among its stated purposes, the Order purports to "provide reasonable regulations for electioneering . . . during a voting period . . . prevent damage to public property and to ensure that a polling place location is sufficiently available during a voting period for those who use the facilities other than for election purposes . . . protect the public health, safety, and welfare . . . [and] [t]o protect the voters and integrity of the election process." (Doc. 7, at 4.) While the Order applies to all county-owned property, its restrictions chiefly concern the Palo Pinto County Annex, where the bulk of early and election-day voting takes place.

To effectuate its stated purposes, the Order creates a "designated area for electioneering," as identified in Exhibit A

of this Court's order, and places restrictions on what political activity may take place in or outside its boundaries.[2] The Order states that "[n]o one shall loiter or electioneer on sidewalks or driveways and interfere with citizen access to polling locations unless the sidewalk or driveway is a part of the [] designated area" (doc. 7, at 5), which does not apply to passive expressions of speech, like wearable buttons or bumper stickers. *Id.*

As for signage, the Order further requires that "[n]o more than six (6) signs per candidate may be placed . . . within the designated area . . . [and that] [p]olitical signs that are personally held by individuals [are exempt], provided, however, such political signs may not exceed the height and size maximums set out herein . . . [and] must not obstruct the view of traffic." *Id.* And among other size and safety regulations, the Order prohibits signs posted with structural material that may damage subterranean water or electrical lines and posting any sign anywhere that "obstructs vision for traffic entering, exiting, or driving in, on or around the Property." *Id.*

Plaintiffs brought suit in this Court, alleging that these restrictions are content-based restrictions on speech and violate

---

[2] It should be noted that the county's Order only places its restrictions on the space beyond the "100-foot boundary." Within that boundary, no electioneering or political activity may take place in any event, in accordance with Texas state law. See Tex. Elec. Code §§ 61.003; 85.036.

the First Amendment. The same day, Plaintiffs filed the instant motions for a temporary restraining order and for a preliminary injunction.

This Court denied Plaintiffs' request for a temporary restraining order (doc. 9) reasoning that, because the county's restrictions on political speech did not discriminate among political **viewpoints** within the broader category of political speech, that they were content-neutral and satisfied the First Amendment. (Doc. 9, at 6.)

Nevertheless, on April 25, the Court convened a hearing on Plaintiff's motion for a preliminary injunction invalidating the County's electioneering regulations as unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

## LEGAL STANDARD

Courts may issue a preliminary injunction where a plaintiff has demonstrated: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury absent relief; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that relief is in the public interest. *See McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021). Where the government is the defendant,

"[t]here is substantial overlap between [the third and fourth] factors." *Nken v. Holder*, 556 U.S. 418, 434 (2009).


**ANALYSIS**

**I.   Likelihood of success on the merits.**

Here, the County's order restricts political speech on all "County-owned property used as polling locations during a voting period." (Doc. 7, at 4.) The Order designates two separate zones on the property where electioneering is permitted. (*Id.*, at 7.) The Order further prohibits "loiter[ing] [and] electioneering on sidewalks or driveways" that "interfere[s] with citizen access to polling locations," except where electioneering takes place within those "designated area[s] for electioneering." (*Id.*, at 4.) And it limits the number of political signs that may be placed within those areas to "no more than six . . . per candidate." (*Id.*, at 5.)

But more wholistically, the order only applies these restrictions to "political" signs and literature. (See *Id.*) And it creates a blanket prohibition on the distribution or display of political literature and electioneering except for "any time other than during the voting period of a particular election" as defined

by Texas state law. (*Id.*, at 4.)

Plaintiffs' chief contention is that the county's order is a constitutionally impermissible content-based restriction on political speech. (Doc. 6, at 12—13.) Plaintiffs allege that the entire order is unconstitutional because it only applies to "political" speech and argue that it therefore fails strict scrutiny. (Doc. 1, at 3.) But Plaintiffs omit that, to afford them this standard of review under *Reed v. Town of Gilbert*, 576 U.S. 155, 166–67 (2015), the Court must first conclude that the county property subject to these restrictions is a traditional or a designated public forum. *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018). The Court concludes that it is not.

Where the government only inhibits speech in a specific location, the alleged ban must first "implicate[] [the] forum-based approach for assessing restrictions that the government seeks to place on the use of its property." *Mansky*, 585 U.S., at 11 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (internal quotations and citations omitted).

> Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums. In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and

those based on viewpoint are prohibited. See *Pleasant Grove City v. Summum,* 555 U.S. 460, 469 (2009). The same standards apply in designated public forums—spaces that have "not traditionally been regarded as a public forum" but which the government has "intentionally opened up for that purpose." *Id.,* at 469–470. In a nonpublic forum, on the other hand—a space that "is not by tradition or designation a forum for public communication"—the government has much more flexibility to craft rules limiting speech. *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37 (1983). The government may reserve such a forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Ibid.*

*Id.,* at 11–12 (internal string citations omitted).

Traditionally public forums are those "which by long tradition or by government fiat have been devoted to assembly and debate, such as parks, streets, and sidewalks." *Burson v. Freeman,* 504 U.S. 191, 196 (1992) (quoting *Perry Ed. Assn. v. Perry Local Educator's Assn.,* 460 U.S. 37, 45 (1983). "Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id.,* at 196–197. But it is also long-established that "streets and sidewalks are not public forums in all places . . . [or] at all times." *Burson,* 504 U.S, at 216 (Scalia, J. concurring) (citing *Greer v. Spock,* 424 U.S. 828 (1976) (holding that streets and

sidewalks on military bases are not traditional public forums)).

This is because the government has, "no less than a private property owner, [the] power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966). And "[n]othing in the Constitution requires the [g]overnment freely to grant access to all who wish to exercise their right to free speech on every type of [g]overnment property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 799 (1985).

Here, the county's order only applies to "County-owned property used as polling locations during a voting period." (Doc. 7, at 4.) Therefore, this case is distinguishable from that in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), because the regulation there sought to prohibit "the display of outdoor signs anywhere within the [t]own." *Reed*, 576 U.S., at 159. There, the Supreme Court skipped the forum analysis because the town of Gilbert sought to **comprehensively** govern speech on public **and** private property everywhere within its jurisdiction—at any time. *Id.*, at 179 (Kagan, J., concurring in the judgment) ("There is no traditional public forum nor do I find any general effort to censor a particular viewpoint. Consequently, the specific regulation at

issue does not warrant 'strict scrutiny.'").

Since the County only seeks to regulate behavior on its own property during a specific period of time, the Court determines first whether the parking lots at issue are a traditional or designated public forum for the purposes of the First Amendment.

The Supreme Court has long recognized the government's ability to restrict access to its property to those who have legitimate business on the premises. *United States v. Grace*, 461 U.S. 171, 178 (1983). And "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *Id.*, at 177. And even where the trifecta of public forums are implicated—parks, streets, and sidewalks—the government may still regulate behavior where streets and sidewalks on its premises are not those "traditionally open to expressive activity." *United States v. Kokinda*, 467 U.S. 720, 727 (1990) (holding that a sidewalk created to give customers of a post office access to and from a parking lot was not a traditional public forum).

That is the case here. The electioneering zones at issue in this case cover two distinct parking areas and include the surrounding grass medians. (Doc. 7, at 7.) Thus, they exclude all other parts of the property from permitted electioneering. Plaintiffs take issue with the county's exclusion of the rear,

employee-only parking lot and the parking lot which separates the two designated electioneering areas. (See Doc. 6, at 10).

But parking lots on government property, especially when appurtenant to a public building, are not those forums "which by long tradition or by government fiat have been devoted to assembly and debate." *Burson*, 504 U.S., at 196.  Like the postal sidewalk in *Kokinda*, which was "constructed solely to provide for the passage of individuals engaged in public business," *Kokinda*, 497 U.S., at 727, the parking lots here were constructed solely to provide access to the building that is now the county annex. And the limited electioneering permitted on county property during an election cycle is precisely the "limited public discourse" that would **not** forfeit the government's right to police the time, place, and manner of speech on its property. *Cornelius*, 473 U.S., at 802 ("The government does not create a public forum by inaction or by permitting limited public discourse, but only by intentionally opening a nontraditional forum for public discourse."). There is no evidence that the County purposely opened its parking lot to continuous public discourse here.

Thus, the County has likewise not created a "designated public forum" by allowing political discourse on its property during the voting periods of an election cycle. In *Campbell v. St. Tammany Parish Sch. Bd.*, 231 F.3d 9.7 (5th Cir. 2000), the United States

Court of Appeals for the Fifth Circuit reaffirmed the notion that the government retains leeway to establish the terms upon which a forum is opened when it chooses to do so. *Campbell*, 231 F.3d, at 940. There, a school board created a policy allowing the public to use, upon application and approval, "some of the public school buildings as a limited public forum . . . [permitting] civic and recreational meetings and entertainment and other uses pertaining to the welfare of the community." *Id.* Plaintiffs, a group requesting permission to use a public-school building for religious meetings, were denied an application to do so. *Id.* And, relying on the stated intent of the school board, the Court of Appeals held that the prohibition on religious meetings passed constitutional muster, because the stated intent of the board was **not** to "permit[] and indiscriminate range of uses," consistent with traditional public forums. *Id.*, at 941. Thus, the Court held that the school board's policy did not incidentally create a public forum for the purposes of the First Amendment.

Here, the County's regulations, which continue to allow electioneering on its property during voting periods, do not incidentally create a public forum demanding heightened scrutiny. The County's stated intent here—to protect the safety of voters and the integrity of the election process while allowing electioneering—does not convert its non-public forum into one

permitting an indiscriminate range of uses consistent with traditional or designated public forums. *Campbell*, 231 F.3d, at 941.

Accordingly, because the property at issue is not a traditional public forum, nor has it become a designated public forum, the county's restrictions must only be reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Mansky*, 585 U.S., at 11.

The Court concludes that they are. The county's restrictions at issue curtail speech and expression, but do so to: (1) allow safe and expeditious access to the county's polling place; (2) preserve access to the facility for non-voting patrons with other legitimate business at the facility; but (3) preserve a substantial amount of space on the property devoted to the voting-day activities and campaigning of various groups. (Doc. 7, at 4-5.) These purposes are both reasonable and accommodating to the election-day activities of those groups who seek to electioneer at polling places.

Moreover, the county's regulations only apply to "political" speech and activity, without discrimination between groups, people, candidates, or causes. (*Id.*) Thus, they do not offend the First Amendment because they do not seek to discriminate based on viewpoint. *Mansky*, 585 U.S., at 11 (citing *Perry Ed. Assn.*, 460

U.S., at 37.). Accordingly, the county's regulations here do not violate the First Amendment.


## II.   Irreparable injury.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). But here, the Court finds and concludes that the county's speech and conduct restrictions set out in its order of April 8, 2024, do not violate the plaintiffs' First Amendment rights. It follows, of course, that they have not then shown irreparable injury.


## III. The balance of equities and the public interest.

Based on the Court's conclusion that the restrictions at issue do not run afoul of the First Amendment, the Court cannot contrarily conclude that Plaintiffs demonstrated that the balance of equities weighs in their favor and that a temporary restraining is in the public interest. *See McDonald*, 4 F.4th, at 255.


### CONCLUSION

Because Plaintiffs have failed to show a likelihood of success

on the merits of their claim, the Court **DENIES** their motion for a
preliminary injunction (doc. 5).

    SIGNED May 7, 2024.

                                              TERRY R. MEANS
                                            UNITED STATES DISTRICT JUDGE